Please call the next case. Will the attorneys who are going to present arguments today please step up to the podium, state your name and the party that you represent. My name is Neal Gainsburg and I represent the plaintiff, Chiquita McKins. My name is Justin Power. I represent the defendant and all of the defendants. All right. We have about 30 minutes for this case. Each side gets 15 minutes and the appellant can reserve time for rebuttal from his time. Yes, I'd like to reserve three minutes for rebuttal. All right. You may proceed. Thank you. May it please the Court, thank you for hearing this case. Thank you, counsel, for arguing with us and presenting your briefs. Your Honors, we believe the trial court erred in two respects in this case, basically. Number one, it erred in its interpretation of the natural accumulation rule as it applies to whether there's a duty when landowners, contractors have contracts to remove snow and ice for beneficiaries of those contracts. And in this case, we have a situation that we argue is based on the restatement section 324A, which has been adopted by the Illinois Supreme Court, which lists the reasons where this duty to remove natural accumulation of snow can occur. And one of those reasons that they say a landowner or contractor may have this duty to remove natural accumulation of snow and ice if there's reliance. And in this case, this is the reliance case. These are commuters that are walking in a station to get to a train, to get to their destination. Some of these commuters are going to work every day. Are you lumping all the defendants together here? Yes, I am, based on the contract. Do you think they're all treated the same? I don't think they're all treated the same, but I'm just starting at the basis. I think that the way that the law has evolved, unfortunately, by the appellate courts, is there's been a split, and that's been recognized by the Allen case and recently by this Jordan case, which the defendants just cited. There's been a split as to landowners, as to property managers, as to snow removal contractors. And I think the Allen court is correct. There shouldn't be a split. There shouldn't be, and that all the defendants should be treated equally, or all the defendants, yes, should be treated equally under this section 324A of the restatement and the original case law that talked about this. How do you fit the landowner under section 324A? The landowner contracts. In this case, the landowner contracts with the property manager and gives that property manager the duty to assume the risk of removing snow and ice. The landowner retains some control of the situation by they're the only person a commuter in this case can notify. We have noticed in this case on this landowner metro, that's the only person, she called the number at the station. Who do you call to complain? Metro. If they're going to put their name and number on that station for complaints, especially when they then contract with the property manager, who then contracts with the snow removal company to remove snow and ice, then I think that under 324, and that's A, that's where we go to A in this section, is that they somehow caused this situation by not responding to a commuter's complaint, that there's ice everywhere and not doing anything. We just don't know really what they did. They don't have any records of what they did. We found that in the trial court. There's nothing in the record of what they did with that notice from the commuter. The property, they claim that they, I think one of their attorneys at one point, and that may be in the record, that they claim they passed it to the property manager, but the property manager at CPS Chicago had no records of what they did with the snow. It basically was ignored by everybody, that these commuters were subject to this risk and hazard of ice. So let's stay with the landowner here. Okay. We won't talk about the snow removal contract. The landowner, we have a common law on natural accumulation. And so if you're, even forget about a commercial property. Just talk about a residential property, right? I've got a home in Illinois, and I don't shovel it. If someone gets injured, they slip and fall on the snow or ice. I'm not liable, right? Yes. Okay. Now let's say that I have a, we'll call it a contract, probably not that formal, but let's say I have an agreement with a neighbor or a snow plowing company. I say, hey, when it snows, I want you to come shovel. I want you to clear my driveway. Maybe I'm very specific. Maybe it's more informal. Are you saying that the moment that the landowner enters into a contract with a third party, they now no longer have the protection of the natural accumulation law? Under certain circumstances, and I think that's where we have to look for the restatement, with 324A. And if they cause or they're part of what led to the risk of the hazard here, snow and ice, then I think the landowner can be liable. And that's where the landowner has an ability to complain about issues. And that's why I think your situation of one individual in the house, where they're not expecting people to be on their driveway or sidewalk or wherever they're going to fall, they don't expect people to complain or anything like that is completely different than a commuter station. Anyone who calls my house and complains says, hey, you've got a bunch of snow on your driveway. And you have a contract to remove it. I mean, it depends on what's in the terms of the contract. In terms of the contract. But the landowner is not making the promise in that contract. The snow removal contractor is making the promise. The landowner is relying on that promise. The landowner, yes, is relying on that, and that goes to the CO. Section 324A talks about liability for the one making the undertaking. The undertaking is being made there by the snow removal contractor, not by the landowner. And by the property manager in this case. Okay, fine, fine. Yes. Right, because there's... Because the property manager of the contract specifically says for the property manager that they assume responsibility for snow and ice removal and to get that away. Understood. I'm just calling it a snow removal contract. Right, right. CPS is a lot more than a snow removal. But they have language in it. Yes. Okay. But they're the ones making the promise. METRA is not making the promise in this contract. They're receiving the promise. So how do they get help? How does METRA get help under 324A? I would just say because they, as the record puts in these communications, they have a phone number there that you can call and complain. And that puts them at allowing, let me say this in a better way, that situation where they're able to take complaints and pass it on to the property manager, pass it on to the responsible parties for making sure that these contracts are complied with, increases the risk if they don't do their job. That's where we think the landowner has some liability here for failure to remove snow and ice based on the terms of the contract and based on the notice here. Because I think notice is big in this case. There is definite notice, no dispute about that, with the ice at the station. The notice and the phone calls made on February 5, 2015, to METRA about the icy conditions. And METRA, their property manager, their contractor, snow removal contractor, don't do anything in the Plain of Falls on thick ice on February 9, 2015. So I agree with you in the extent that they are putting in the contract delegation to somebody else, but I believe that if you examine 324A and under the Eichler principles where the theater was still responsible. Can't your interpretation lead to some negative consequences? For example, a diligent homeowner says, well, I'm not going to hire anybody because if I hire someone to remove the snow, that increases my liability. Insurance companies, homeowners insurance companies say, well, we're going to exclude coverage where you hire a third party to remove the snow. Doesn't it create a situation where a homeowner says, I'm just going to wipe my hands of it, I'm going to let snow fall and I'm not going to do anything? I don't see that being a big of a problem where there's homeowners who are not hiring contractors or not shoveling snow on their own. I think that in that situation, there's lack of, there could be notice issues, there could be other issues of who's actually on their property. They're not expecting people to be on their property every day as a commuter station. We have commuters in this station who go there every day and they see the snow removal. They see icing, ice and snow and salting on the ice. They see clear pathways after a snowstorm or ice storm. And when they go there Monday through Friday, every day of the winter, they expect that when they arrive. Not just to be able to get to work on time, but be able to get to work through a clear path. So I think that's the distinction where a homeowner situation, you don't have people on your home every day expecting it to be clear. I don't think anybody who's a guest at a residential place can have that expectation as opposed to a commuter who's at a station who sees that every day. When they get to work on, or when they get to the station to go to work on Tuesday and it snows the night before and it's all clear, they expect that the next week, the same thing is going to be there. They're not worried so much, perhaps, about the snow and the ice, but about catching the train. They've got a lot of other issues. And if they have, by seeing that it's been clear, that there has been work performed in that area, it's sort of to their benefit. And that's where I think there's a distinction between the Allen case and this Jordan case, where we just have consumers or people who are at a business or maybe at home for a one-time situation where there's no notice there, there's no expectation that this is going to be like this every day as opposed to what a consumer has. And that's where, again, go back to the reliance figure, which is on 324AC, that these commuters are relying on it and this snow removal is done for their benefit. The contract specifically states that no ice removal or no ice will be tolerated. All ice has to be removed because that's what we expect commuters, people going to work, people going about their daily lives to experience in a commuter station. So I think this is the case beyond the individual store, the mom-and-pop store, or even a homeowner who has some people come to their house every once in a while. This is a case where if we expand the natural accumulation rule to say, you know, commuter stations, maybe there's no duty then, maybe, you know, commuters are more now, we have to worry about catching the train, about getting to work on time, and now we've got to worry about snow and ice, too. Even though we see them clearing it, they may not do their best job, they may not even show up or respond to a complaint, and you, the commuter, has to worry about that. So I think that based on 324A, based on Eichler, Schoenbeck, and the Tressler cases, that that, and the Allen case, too, the Allen case is where I think this Court should follow. That line of cases, the Allen case talks about there is a duty to remove natural accumulation of snow and ice if nothing is done. And in this case, nothing was done following Laisha Berger's complaint on 2515. There was no icing, even though the contract required it. There was nothing done to prevent the ice that my client fell on on February 9th. But we also believe that even if this Court were to conclude that these type of commuter stations, there is no general duty to remove natural accumulation of snow and ice, despite the contract language in this case, that there was unnatural evidence, sufficient and significant evidence of unnatural accumulation. And I think when we go to the Hornacek case, they talk about two elements for this unnatural accumulation. Notice, and that the condition was caused by some sort of unnatural or aggravation of the ice situation. And here we have the notice. I've talked about that already, that we have the call to METRA on 2515 of the icy conditions. And we have also evidence of unnatural conditions, and that is the melting of snow piles. In this situation, on February 1st through 3rd, and the record has different amounts, and it's a factual issue of how much snow, but there had to be up to 20. There's some evidence in the record from 20 inches of snow between February 1st and February 3rd. And we have Trisha Burgess' affidavit of seeing snow piles, which makes sense and is consistent with that type of snow pile. Snow piles pushed up against the pay boxes near the ramp where my client fell, and she sees melting. And then we have a swing of temperatures. And the temperatures, again, support that these snow piles, which were caused by snow removal efforts, after the 20 inches of snow were melting and leading to an unnatural condition. So we have notice. We have a natural condition. And all that the Hornacek case said is that there has to be a plausible link, just a plausible link between the melting of the snow piles and the ice. And I think that Trisha Burgess' affidavit, the testimony below of my client about how she fell on the thick ice, squarely shows that this case falls in the Hornacek situation and that we have sufficient evidence to survive a summary judgment motion. Questions of fact as to what was the cause of this thick ice that my client fell on and that we have a plausible link between the snow piles melting and the actual ice. It was all in the same location. So we would ask that this Court reverse both findings of the trial court. And basically, it was the two findings of the trial court. Number one, that there was no duty to remove natural accumulation of ice and snow. Based on the contractual language, based on Restatement 324A, we also ask that this Court reverse the summary judgment ruling in favor of the defendants that there is no finding of notice or unnatural accumulation that was caused by snow removal efforts. Counselor, before you go, I meant to ask you one thing. Sure. Just about the general makeup of this train station. So Waukea-Mickens was walking down a downhill ramp? Yes. Is that right? Okay. So going down what, to the train platform? Yes, to the train platform. Okay. So the pay boxes where you said snow was piled are above it. Yes. So your theory being the snow melted. Snow melted. Yes. And the water ran down. Yes. And the water ran down and caused thick ice. Yes. As the temperatures got higher. I don't understand. Yes. It's a downhill ramp. It's a downhill ramp. It's actually not all that clear in the record from the testimony. I think everyone assumes that they all know what they're talking about in the depositions, but I don't think everyone ever asked her was it a downhill ramp. Yes. It was down to the 45-degree angle sort of. Right. It's sort of an angle downward. I thought that, yeah, it was a ramp situation. It was going up. It was going down. Okay.   those two issues that we discussed. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Counsel. Good afternoon. Again, I'm Justin Power. I represent all defendants and the apologies in the case. And thank you for considering the arguments on appeal. I did yesterday file a motion asking the court to consider Jordan v. Kroger. The motion is granted. All right. Thank you. And I'm going to start out with the arguments and the theory. There's two theories here raised by appellants and at summary judgment. And I understand that the standard is a de novo review. That is, you have to look at all the evidence that the trial court had. But I think that after you've looked, reviewed all that evidence, admissible evidence, that you'll find that the trial court did not err in granting summary judgment under the circumstances. But I'm going to talk about the two theories separately. The first theory that I'm going to discuss that the plaintiff raised is the unnatural accumulation theory. And as I think the court pointed out at the end of the appellant's argument, while there may be photographs that are in the common law record, I don't think it's very the layout of where these parking or where the ticket area is in relation to the ramp is all that clear. It's definitely not, I believe, that the evidence is that it's not clear from the affidavit of Ms. Spurgey, who testified about her observations I think four days, I'm sorry, five days before Ms. Mickens fell. And the significance to our position on appeal is to Ms. Spurgey's testimony through her affidavit that Ms. Spurgey's, what she says in her statement, that she had seen sheets of ice had formed and that she had seen piled snow. It's insufficient under the case law to just say that she generally saw sheets of ice and piles of snow. It's not sufficient to meet plaintiff's burden at summary judgment to show that an unnatural accumulation of snow or ice was caused by any defendant and that that unnatural accumulation contributed or caused the fall in this case. And I just want to point out. She said in her affidavit that there was snow piled around the parking lot pay box and the ramp near the pay box, right? And the ramp near the pay box is where the fall occurred, right? That's correct. So there's piles of snow on the actual inclined ramp where the accident occurred and right above it in the pay boxes. She says around the pay boxes and the ramp near it. So the fact that she says it's around the pay box and the ramp near it, it still begs the question, I'd submit, that where was this? Because the area around the pay box is level, okay? And the ramp is, I'm not sure what the incline level is of that degree, but the ramp starts at a certain point. We don't know where these piles of snow are in relation to where the ramp is. I don't think that this statement is sufficient for the court to find a reasonable inference that these piles of snow were actually on the ramp themselves or that how close they are, how close they are to this ramp, the beginning of the ramp, such that the court can draw, find that there's an inference that these piles of snow caused any kind of like... Well, maybe a painter shouldn't be given summary judgment, but that still doesn't ask the question whether the defendant's entitled to summary judgment. No, that, right. Yeah, the point I'm raising is that there is no genuine issue of fact under the circumstances because if there was a reference to photograph or some diagram or something with Ms. Bergey, or if there was some more facts through Ms. Mickens' testimony, then I think there might be a situation where, unlike the other cases, the cases that are cited in the briefs, where the court did find a connection between the amount of snow melting and refreezing and the area where Plano fell, this does not meet that standard. And, well, how did the ice form then? So your theory is that the ice had been there all along and David Hayes, well, I think the snow plower, right? David Hayes didn't remove it when he first... Because he plowed the snow over the mid, you know, from like 10 to 2 in the morning, it sounds like, between the days of the 4th and the 5th, and that next morning at 7.45 a.m., Feisha Berge comes up and says, I see ice on the ramp, a sheet of ice on the ramp. So how did that ice form? Well, she... No, actually, she doesn't say she sees... Ms. Bergey doesn't say she sees sheets of ice on the ramp. She talks about ice in general in the parking lot. She said, I saw that sheets of ice had formed on the ground at the 147th and Sibley Station, especially around the pay box and the ramp near it due to piled snow that had melted and re-frozen. Well, I'd submit... That's not the ramp that she fell on? That's not the ramp that Mickens fell on? The ramp that she's talking about in this paragraph 4, I expect that that's the ramp that Ms. Mickens fell on. And how did the sheet of ice get there? Well, I don't know, but I'll tell you that the weather reports indicate that there's no melting or freezing during that time up to the time that Ms. Bergey is there, four days before Ms. Mickens fell. There is no melting. It never gets above freezing. So the weather reports themselves don't support this melting and re-freezing. You mean in the interim between Feisha Berge and Joaquina Mickens, there was no... The temperatures didn't go over freezing? No, I'm talking about at the time. Okay. You mean... Ms. Bergey's conclusion that this ice that she saw was because of melting and freezing is not supported by weather reports. I don't know how that... What she saw, I don't know how that formed, but I don't think all the evidence in the case supports that because of the temperatures. But the next question is, what Ms. Bergey... Assume that there's enough evidence for the court to find from what she says, that there's some condition that runs to the area where Plano fell. And Ms. Bergey doesn't know where Plano fell. She doesn't know that. And the next question is, isn't it speculation to say that what was existing at the time that Ms. Bergey made her observations, on the 4th, I'm sorry, on the 5th, whether that caused whatever happened on the 9th when Ms. Mickens... I believe it's because there's nobody observing this in the interim, and there's no details from Ms. Mickens' testimony about a snow pile or seeing ice flow from a particular condition, the snow pile, that there's not... That it's speculation to find that whatever Ms. Bergey talked about four days before had any connection with... Counsel, don't we allow reasonable inferences at this stage? I mean, we have had cases where... Where the grade was such that the snow pile, melting snow that could have gotten over to where the ice was found in that particular case, it didn't really make sense because gravity wouldn't have necessarily required melting snow to travel sideways. And so they said, look, unless you can get some expert to come in here to sort of explain how this could happen, we don't see it, and it's speculation. But then there's other cases that talk about things like we don't have to blind ourselves to the obvious fact that when it gets above freezing, snow will melt, that water will run downhill if it's on an incline, the laws of gravity. And in a case like this, if there is evidence that there were snow piles on the ramp and right above the ramp, and we know that the temperatures fluctuated in between these dates, that's undisputed. That came from you, from your evidence. And we know there was no additional precipitation. And isn't that fairly strong circumstantial evidence that the snow melted and the water ran downhill, and then when it refroze, it became ice? And I'm by no means saying that's what happened, counsel. But isn't that a reasonable inference from this evidence? I... Respectfully... Including summary judgment? Yeah, respectfully, I don't believe it is a reasonable inference. There is some evidence, first of all, as to an alternative way that this... There's evidence that there was an inch of snow that fell on the 6th, and that there is this temperature change in the interim, and that could very well have caused ice to form, which is... That's a natural accumulation. There's no evidence that that's not. But there is evidence of an inch of snow falling after Ms. Bergey is at the location. But the reason I don't believe it's a reasonable inference under these circumstances, Your Honor, is that, again, she doesn't... Ms. Bergey says that she sees around... Looking at paragraph 4, she sees piled snow... She makes the conclusion, due to piled snow, these sheets of ice, that had melted and refrozen. Now, even though you're entitled to provide facts in a 191 affidavit, but the court doesn't have to consider conclusions. No, but the paragraph before that says, at that date and time I saw that there was snow piled around the parking lot pay box, the ramp near the pay box, and elsewhere. How is that not testimony that there was snow piles on the ramp where this accident occurred? Well, there's... Because the word around as opposed to on? I mean, it's maybe not the most perfectly constructed sentence in the history of sentences, but why would she be so specific as to talk about the ramp if she wasn't saying it was on the ramp? Well, Your Honor, I'd submit that it's still not specific enough, and I'm trying to answer your question, but I don't think it's specific enough for the panel to find that there's reasonable inference. Because of the lack of specificity, again, it begs the question, where this snow mound was in relation to where Ms. Nickens was four days later. And so... And again, because of the passage of time, there's always... to be drawn that it is from, that this condition is from snow from the sky and melting and refreezing, which is supported by the weather records here. And in fact, I think that that's the overriding inference in common experience, and I think that the courts have recognized in the natural accumulation rule. But actually, there's some conflict in the record about whether or not there was snow on the 6th. Didn't one company say there was no snow? And then CPS said there was an inch. Another one said there is no snow. Well, I believe that the weather records show, from the Internet, show that there was an inch of snow on that day. And there's some dispute between both of those. The reason I included that in Applee's brief is just to explain things that were raised in the appellant's brief to see what the sources of information were. I thought you conceded in the briefs that there was no intervening precipitation between the plowing on the 4th and the 5th and the 9th. I thought you said that in writing. I don't have it in front of me. But did you not concede that the evidence showed there was no intervening precipitation? Your Honor, I don't believe that we conceded that there was nothing. But the records are that there is an inch of snow on the 6th. And the other inference would be, reasonable inference, would be that in any situation where there's snow removal after 20 inches of snow over a period of two days and then three more inches of snow, that not all of the snow is going to get removed. That includes the snow in the area of the ticket area and the ramp. And that's a reasonable inference that that snow could have melted and refrozen. And if there are reasonable inferences to be drawn and equally reasonable inferences, then the plaintiff has now met the burden as far as creating a genuine issue of fact. If there's competing, equally reasonable inferences, you get summary judgment? In a case like this, yes, because of the snow, the natural accumulation rule, yes. Then what does that do with respect to the restatement? That seems not to me to be reconcilable. Well, restatement is the issue dealing with the duty to remove natural accumulation. So the – and I can address that now. But the natural accumulation rule, I think, it was addressed by the court in Jordan. And in a situation – and Kroger was a – in that case, Jordan versus Kroger, the first district found that Eichler, which had not been found in favor by other appellate cases, should not be followed in a situation like this where there's an allegation of failure to do reform work under a snow removal contract, which is part of their theory or one of their theories. Is that what you think Eichler said? Eichler, I believe – Eichler stands for the proposition that there is common law viability under certain circumstances for – based on a contract. Right. Yes. And I believe that, as Jordan – Do you think Eichler opposed the natural accumulation rule? Excuse me? Do you think Eichler talked about the natural accumulation rule? Or was it just focusing on the language of the contract? Well, I think Eichler – I think it's a lot broader than just the language in that contract. I think Eichler talked about liability where somebody agrees to do snow removal regardless of any type of evidence of reliance. Because even in those – even in Eichler, they talked about reliance where, you know, you might – possibly there might be reliance by one party of the contract to the other, but there's no evidence of reliance as to the third party to the pedestrian. So Eichler, I think, has implications beyond the language of the contract in that case. I think it – Eichler suggested there's liability under – in general, like liability for failure to remove natural accumulations. And I think Jordan addresses that. And I would – I'd submit that – But Eichler held that because that's what the contract said, right? I mean, one of the contracts in that case, I think it was in an easement actually, but whatever, it was a written contract, where I think a company called Urban said that they would remove all snow and ice. And Eichler held, well, those guys don't get summary judgment for failure to remove the snow because they promised to remove it. And under 324, they have to perform that reasonably, which is a question of fact. There was another contractor in Eichler, I think called Wellhausen or something, that was actually a snow removal company. And they looked at the language of that contract and they said, ah, these guys don't have any duty to remove the ice. Because it says so in the contract. It says remove snow but not ice. And so that contractor, because the accident occurred on ice, that contractor was found to have no duty and got summary judgment. I read Eichler is just looking at the – under 324 saying there's got to be a contractual – there's got to be a voluntary undertaking, right? And if it's a contract, then it's in the contract. And Eichler said, let's look at what's in each of these contracts, what they promised to do, was that breached or not? It just seems like a straight contract test. I mean, it's a 324 case, but it's where the undertaking comes via contract, like we have here. Shouldn't we just be looking at the contracts here about what you're – not Metro, but what CPS and Four Seasons promised to do in their contracts? And then determine whether they did that with reasonable care? I think that – well, those contractual – let me say this first. Contractual provisions have to be interpreted in terms of what a reasonable person could do under the circumstances, that not all snow can be removed. And I think the courts recognize that in appellate decisions. Well, 324 itself says reasonable care. So, yeah, you don't have to be perfect. You have to use reasonable care to perform. That's correct. But perform what? And perform what? The answer to that question is perform what you promised to do in your contract, right? So CPS made a series of representations and promises in their contract to Metro. Four Seasons made a series of representations to both Metro and CPS, I would say, in their contract. Don't we look at what they promised to do, ask whether they reasonably performed those promises? I don't – under the – in view of the Jordan case and those cases, Wells and McBride that have considered Eichler – well, Jordan specifically looked at Eichler and Wells. Jordan considered it. Wells and McBride. And also – Norton and McBride. Right. They didn't consider – well, they didn't consider Eichler. That's correct. But – or if they did, they – They did. They did. They didn't consider that. All right. So – I mean, why are we talking about a natural accumulation rule if the duty is based solely on what's in a contract? If the contract wants to talk about a natural accumulation, fine. Then we'll – because that's part of the contract. But why are we importing a natural accumulation rule into a contract discussion? Because that's – well, because that's the basis for claimant's theory that there's liability for failure to – allegedly – alleged failure to salt by my client. So there's a theory as to failure to do natural – to remove natural accumulation. And that's why – Well, failure to remove snow. I mean, he's not really using natural accumulation. The trial court thought, I think, that you needed to show an unnatural accumulation. So we get into that conversation. But 324 is the basis of liability, right? 324A, voluntary undertaking for the benefit of a third party. And what is that undertaking? And I think the only answer to that question is the undertaking is what you promised to do in the contract. Would you agree with that? Yeah, but just going back to what you suggested with the trial court. The trial court looked at everything. They didn't – the trial court did not make specific findings. It's sort of – they granted summary judgment. So because there's two theories here, the unnatural accumulation theory and this failure to remove natural accumulation. Well, so to answer your question, it's not enough, I believe, that even under the language of these contracts to say that there's – and again, I'm considering Jordan, which was decided a few months ago. It's not enough to say that there has to be, at least in the reasoning of Jordan, some reliance. And Jordan involved a customer at a store who fell in a parking lot. And in that case, there was evidence of no snow removal in the interim. Did Metro rely on CPS to get this snow removal by contract? I don't – well, Your Honor, I don't know if I can say that there's no specific evidence of reliance, okay? But I think – I don't want to avoid the question, but I think that the – under Jordan and those cases that, like, Wells and the other – I think Wells even talked about third-party beneficiaries and the law dealing with that. I believe there is some type of reliance by the plaintiff. Did Wells even mention Section 324? No, but it talked about intended versus incidental third-party beneficiaries. They did talk about that. Is that the same thing as 324A? I would submit that, at least in the way that Jordan interpreted it, that the intended versus incidental beneficiary is part of that analysis under 324A, I believe. And I – and that's why they also distinguished Schoondyke and the other case that deals with – yeah, Tresler, that deals with kind of an in-association and deals with a landlord-tenant where the landlord said in his handbook, I'm going to provide snow removal. We don't have evidence of reliance, just as there was no evidence of reliance in Jordan. You may not have reliance by Mickens, but Section 324A does not require that it's the third party that relied. It could be that, but it also could be the person who entered into – who got the promise from you relied on it, meaning they didn't take any other steps to perform the service because they relied on your promise to do it. So, I mean, METRA enters into a contract with Chicago Parking Service, or CPS, to remove the snow. They rely on CPS to do that. And in turn, they both – CPS subcontracts the four seasons and relies on them to do it, and METRA is a part of that because they have to approve the subcontracts. Isn't that the reliance that he needs to show under Section 324? Does he have to show that it was Mickens who relied on it? I believe that because there's no duty to remove natural accumulations, I believe that that's part of the reasoning in Jordan, that because of that, that beginning with that premise of no liability for natural accumulation, you do have to have reliance by the third party, some type of reliance, and I don't think there's no evidence of reliance here. That's consistent with how Jordan also distinguished Tressler and Schooner, because in those cases, there's knowledge by the pedestrian, by the person injured, the third party, of a promise to provide snow removal. And we don't have any knowledge or reliance in this case, just as there was none in the Jordan case. So I guess I would ask you to follow the reasoning in Jordan for the reasons that I stated, and although they're oral and not in my brief, I think that they're compelling reasons, and as the court had brought up in Appellant's argument, one of the policy considerations that Jordan had brought up and discussed was the consequences of liability for failure to remove natural accumulations. What could happen? And I think it extends beyond a homeowner situation, saying I'm not going to hire somebody to do this work if I can be liable. It extends to commercial scenarios, too. That is, if there's lawsuits based on failure to remove natural accumulations, the only evidence you have to show is that somebody fell on snow or ice in an area, which was the subject of snow. Lawsuits against who? Against landowners, against contractors as well. And that, after a certain point, will end, for that matter, I guess coverage for those type of potential losses, but also, as happened with other areas of law, like construction, that could also impact on how people's desire not to do certain things because of the risk of lawsuits, and basically it could eliminate the natural accumulation rule, and that's what Jordan had discussed. So, Your Honor, I talked about 324. And so, again, for the reasons that I stated orally, I believe that analysis, the court in Jordan versus Kroger did talk about 324 and found that under the circumstances, and I think the overriding reason was problems with natural accumulation liability, but also the fact that there is this person that the reliance, not by the person injured, but the person that that reliance starts with is somebody who does not have a duty to begin with, a duty to remove snow and ice. Because of that, I think that they found that reliance of the person injured, that's necessary for liability under, so that's the only situation where they've recognized liability for the failure to remove natural accumulations. So, again, I believe that the court, although there was no specific finding, I believe even though the court considered the affidavit and did not strike Ms. Spurgey's affidavit at trial, he considered that along with the other information, was not able to find a reasonable inference that Ms. Spurgey fell because of a natural, an unnatural accumulation created by any of the defendants, and it was before the court, it was in the arguments about the natural accumulation theory raised by the appellants, and the court considered that and found that there was no basis for that, there was no question of genuine issue of fact, and found that there was a basis for summary judgment under both theories. So I'm requesting that the court affirm the summary judgment that was entered by the court in this matter for those reasons, and also the reasons that I mentioned both in my brief and orally with regard to the Jordan case. Thank you. Okay. Rebuttal. Mr. Gainsbourg. Thank you, Your Honors. Briefly, just to start with the affidavit of Yesha Burge, I think that sufficiently establishes factual issues. We're at a summary judgment stage. The plaintiff doesn't have a burden to prove their case. We're not in front of a jury. We just have to show that there is sufficient evidence in the record that they can make reasonable inferences that there was melting snow and ice that resulted from that. Unfortunately, the burden that defendant sort of wants to place on us is that we have to sort of reenact the situation. Ice and snow disappear in days. Ms. Minkins is injured. She can't go back there because of her injury. She can't go back in time before her injury to recreate snow and ice. I mean, that burden is so that we can know exactly how the snow and ice looked at the time that defendant wants it to look like, saying that, well, it wasn't that close to the ramp or it was in this area of the parking lot or this area. We can't really reenact it. We can't because snow and ice changes hourly. And that's part of what the restatement discusses. And I think both, you know, the natural accumulation rule and unnatural accumulation are sort of intertwined in this case because the restatement section 324 talks about that people undertake to render services to another and failure to exercise reasonable care increase the risk of such harm when they have a duty. And I think that in this case we have a situation with a lot of snow. We have a snow removal company that comes in, piles snow up, and it's reasonable inferences from that. And then there is questions of fact in the record as to how much snow occurred after the snow removal processes and the piles of snow. And some of the amounts in defendant's brief or in Kelly's brief talk about there was no additional snow after Fischer-Birch saw the ice. So that there is reasonable inferences in that, in the record, of unnatural accumulation from the snow causing my client to fall on the Monday morning after the swings in temperature. So that's where I think that there are sufficient factual issues and just by the conversations we've had here about and the record and the issue in the record about what Fischer-Birch saw, about what my client saw, about what the snow removal person saw, about the weather reports, about the amount of snow and the differing amounts, about the notice issue, too, which hasn't even been addressed. The fact that there was notice in here, and that goes to the Hornetside case, that there is a question of fact as to whether unnatural accumulation of ice caused my client to fall. Back to the first, and again, related thing about the restatement and the duty to remove natural accumulation. Yes, if we go by the Eichler case, I think this is clearly on point by the Eichler case, where there is a contractor and a property manager who Metro is relying on to do this duty, to remove snow and ice, to specifically salt. No icing is tolerable. You need to salt, and that's in the Metro contract. And under Eichler, there's the reliance there between the contractors. And I think that the Allen case sort of limits Eichler but still stands for the proposition that if you don't do anything and you have this language in the contract and there's reliance between the contractors and the property or landowner, then there is a duty to remove the natural accumulation of snow. And I think that this Court should follow Eichler and Allen. The Jordan case is sort of, you know, I don't have to – I haven't been able to address that case, but I think the Jordan is a unique situation where we have like a stand-alone story, somebody who goes to that store perhaps for only one time, and snow or ice just suddenly appears. And there may have been a notice issue. And that's why I think the trial court found was more of a notice issue in the Jordan case. But, I mean, I don't think that should be expanded into this situation where we have clear language in the contracts about the duties of the landowners, and we're going to reliance on the injured party. I think in this case there is clear reliance on commuters who go to a station every single day. Ms. Micken says she took the Metro train to work downtown or in the River North area every day, Monday through Friday. So this is February 9th when she calls. So in December, in January of that winter, she sees snow removal operations. She sees icing and tossing of ice. She sees all that. And so there's reliance that that's going to happen when she gets to the train station Monday morning and is trying to catch her train to work. I don't know how you can say that the consumers of this Metro station are not relying on the snow removal contracts and that there is a benefit to them, unlike in the Jordan case when there was really no benefit to that injured party. There is clearly a benefit to Ms. Mickens like any other commuter who is going to work or going to bond their business and trying to get to the train on a clear path, especially when they see that clear path or they see the snow removal operations throughout the winter. So I believe that we have presented sufficient evidence in the record of a duty under the restatement, Section 324A, that all three of these defendants, and again, summary judgment is granted to all three defendants, the landowner in Metro, the property manager at CPS Chicago, and snow removal contractor, all three of these defendants should be held to have a duty and summary judgment should be reversed. Also, that there was sufficient evidence of unnatural accumulate, sufficient evidence of natural accumulation causing Ms. Mickens to fall, and therefore, summary judgment should be reversed on that issue too. And thank you, Your Honor, for the time. Thank you. Thank you. The case was well briefed and well argued. The case will be taken under advisement and the decision issued in due course. Thank you.